OP 21-0173

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 120-1

BETH MCLAUGHLIN,

      Petitioner,

  v.

The MONTANA STATE LEGISLATURE,
and the MONTANA DEPARTMENT OF
ADMINISTRATION,

      Respondents.

ORIGINAL PROCEEDING:      Petition for Original Jurisdiction

COUNSEL OF RECORD:

      For Petitioner:

            Randy J. Cox, Boone Karlberg P.C., Missoula, Montana

      For Respondent Montana State Legislature:

            Austin Knudsen, Montana Attorney General, Kristin Hansen, Lieutenant General, Derek J. Oestreicher, General Counsel, Helena, Montana

      For Respondent Montana Department of Administration:

            Michael P. Manion, Department of Administration, Helena, Montana

            Dale Schowengerdt, Crowley Fleck PLLP, Helena, Montana

                  Decided:  May 12, 2021

Filed:

                             _____
                                     Clerk

FILED

05/12/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: OP 21-0173

Justice Laurie McKinnon delivered the Opinion and Order of the Court.

¶1   Respondent, Montana State Legislature (Legislature), has filed in this original proceeding a motion "for the immediate disqualification of all Justices" of the Montana Supreme Court.[1]   Petitioner, Beth McLaughlin (McLaughlin), the Judicial Branch's Court Administrator, has responded and objects to the Legislature's motion.   To best address the Legislature's motion, some discussion of the procedural background and underlying issues is necessary.

¶2   In an original proceeding before this Court filed March 17, 2021, *Brown, et. al. v. Gianforte*, OP 21-0125, the Legislature, as an intervenor, and Respondent Governor Greg Gianforte raised concerns about a Montana Judges Association (MJA) survey of its members (poll) facilitated by McLaughlin regarding Senate Bill 140 (SB 140).   At the time of the poll, the Legislature was considering SB 140.   SB 140, which has since been signed into law, changes the way the Governor fills vacancies for judges and justices in Montana. After learning of the MJA poll, the Legislature requested McLaughlin provide information on the poll.   McLaughlin provided the final tally of the poll but indicated some of the emails from judges responding to the poll had been routinely deleted.   On April 8, 2021, the Legislature issued an investigative subpoena to the Department of Administration, which administers the Judiciary's computer system, seeking the production of "[a]ll emails and

_____

[1] Since the Legislature's filing of the instant motion, the Court appointed District Court Judge Donald Harris to preside in place of Justice Jim Rice, who had recused himself.  The Legislature has not indicated whether their disqualification request pertains to Judge Harris.  However, for purposes of this ruling the Court will assume that it does.

2

attachments sent and received by Court Administrator Beth McLaughlin between January 4, 2021 and April 8, 2021 . . ." and "[a]ny and all recoverable deleted e-mails sent or received by Court Administrator Beth McLaughlin between January 4, 2021 and April 8, 2021 . . . ." The legislative subpoena required production of the documents by 3 p.m. the next day, April 9; however, the Court was informed that the Department of Administration began producing the documents immediately. In the subpoena, purportedly issued by the Chair of the Senate Judiciary Committee, the Legislature did not provide a reason or purpose for its request or otherwise state what it was investigating. The subpoena was issued without notice to McLaughlin or to the Judicial Branch. When McLaughlin learned of the investigative subpoena one day later, on April 9, several thousand emails involving her communications with Montana's judges and justices had been released to the Legislature. It now appears there were more than 5,000 Judicial Branch e-mails disclosed to the Legislature. The Legislature determined on its own that many of those e-mails were not privileged, sensitive, or work related, and it released these judicial communications for distribution to the press. In response to an emergency motion filed by McLaughlin, this Court entered an order on April 11, 2021, quashing the subpoena until we could address the scope and parameters of the Legislature's subpoena power when privileges have been asserted. Thereafter, McLaughlin, who was not a party or intervenor in OP 21-0125, filed a Petition for Original Jurisdiction and Emergency Request to Quash/Enjoin Enforcement of Legislative Subpoena on April 12, 2021, which began the instant proceeding.

¶3    Also, on April 12, 2021, the Court received a letter from Lieutenant General Kristen Hansen, of the Montana Department of Justice, stating that she had been retained

3

by the legislative leadership to "represent the interests of the Montana State Legislature to resolution [sic] of the ex parte Motion of Beth McLaughlin . . . ." In her letter, Hansen wrote:

> The Legislative power is broad. In fulfilling its constitutional role, the Legislature's subpoena power is similarly broad. The questions the Legislature seeks to be informed on through the instant subpoena directly address whether members of the Judiciary and the Court Administrator have deleted public records and information in violation of state law and policy; whether the Court Administrator has performed tasks for the Montana Judges Association during taxpayer funded worktime in violation of state law and policy; and whether current policies and processes of the Judicial Standards Commission are sufficient to address the serious nature of polling members of the Judiciary to prejudge legislation and issues which have come and will come before the courts . . . .
>
> The Legislature does not recognize this Court's Order as binding and will not abide [by] it. The Legislature will not entertain the Court's interference in the Legislature's investigation of the serious and troubling conduct of members of the Judiciary. The subpoena is valid and will be enforced.

In like regard, the Legislature, through its counsel, Derek J. Oestreicher, filed a Motion to Dismiss stating the Montana Supreme Court "lacks jurisdiction to hinder the Legislature's power to investigate these matters of statewide importance," and that this Court's order "will not bind the Legislature and will not be followed." These representations from counsel that the Court's orders would not be followed were disruptive to the Court's functioning as a tribunal and the administration of justice, particularly because the Court was dealing with the unrestrained and ongoing dissemination of thousands of Judicial Branch e-mails.

4

¶4      Two days later, on April 14, 2021, and during the pendency of the instant proceeding, the Legislature issued a subpoena to each justice of the Montana Supreme Court demanding that the justices appear before it on April 19, 2021, and produce:

> (1)      Any and all communications, results, or responses, related to any and all polls sent to members of the Judiciary by Court Administrator Beth McLaughlin between January 4, 2021 and April 14, 2021; including emails and attachments sent and received by your government e-mail account . . . as well as text messages, phone messages, and phone logs sent or received by your personal or work phones; and any notes or records of conferences of the Justices regarding the same.
> (2)      Any and all emails or other communications between January 4, 2021 and April 14, 2021 regarding legislation pending before, or potentially pending before, the 2021 Montana Legislature; including emails and attachments sent and received by your government email account . . . as well as text messages, phone messages, and phone logs sent or received by your personal or work phones; and any notes or records of conferences of the Justices regarding the same.
> (3)      Any and all emails or other communications between January 4, 2021 and April 14, 2021 regarding business conducted by the Montana Judges Association using state resources . . . .

The subpoena provided that:

> [t]his request pertains to the Legislature's investigation into whether members of the Judiciary or employees of the Judicial Branch deleted public records and information in violation of state law and policy; and whether the current policies and processes of the Judicial Standards Commission are sufficient to address the serious nature of polling members of the Judiciary to prejudge legislation and issues which have come and will come before the courts for decision.

¶5      Also on April 14, 2021, Hansen sent e-mails with an attachment entitled "PRESERVATION REQUEST" to all District Court judges, their staff members, and employees or contracted employees of the MJA "who might have received emails from or sent emails to Ms. McLaughlin" between January 4, 2021 and April 8, 2021. The letter asked all recipients to segregate and hold "any emails, documents, notes, or other records"

5

sent to or received from McLaughlin and to "preserve all existing materials relevant to this dispute . . . ." Hansen asked the recipients to suspend any deletion, overwriting or destruction of such documents and that "[t]his hold overrides what might be your normal retention policy so these documents and data should not be deleted even if otherwise allowed." Hansen stated that the Legislature had previously sought the information from McLaughlin but "received an unsatisfactory response."

¶6 On April 16, 2021, this Court entered its first order in these proceedings, which continued the injunction against the subpoena issued to McLaughlin in OP 21-0125; set a briefing schedule; and stayed enforcement of any subpoenas for judicial communications, including those served on the Court on April 14, 2021, until the issues presented by the Legislature's subpoenas could be adjudicated during the course of due process. At the time, and in light of the representations made by Hansen, Oestreicher, and the Legislature, it was unclear whether the release of judicial e-mails to the Legislature was ongoing and would continue indiscriminately. The Department of Administration has since retained counsel who immediately assured this Court that it will abide by the Court's orders and would not release any more judicial communications unless directed by the Court to do so. On April 19, 2021, every justice of the Montana Supreme Court appeared before the Legislature and answered, to the extent permitted by the Montana Code of Judicial Conduct, questions propounded by the Special Joint Select Committee on Judicial Transparency and Accountability, a newly formed legislative committee to investigate alleged misconduct in the Judicial Branch.

¶7 In its Response to Petition for Original Jurisdiction, the Legislature provided its purpose behind seeking McLaughlin's records:

> The purpose of the Select Committee is to investigate and determine whether legislation should be enacted concerning: the judicial branch's public information and records retention protocols; members of the judicial branch improperly using government time and resources to lobby on behalf of a private entity; judges' and justices' statements on legislation creating judicial bias; and the courts' conflict of interest in hearing these matters.

Important to the forthcoming discussion, the MJA includes Montana's district judges and justices.

¶8 Before addressing the law as it applies to the Legislature's disqualification motion, we make several observations about the motion. First, the Legislature argues that "[t]his matter has arisen because evidence of judicial misconduct has come to public light" and "[t]he Legislature is actively investigating that misconduct, and the judiciary is the target of that investigation." Presumably, this refers to the MJA poll and the Judicial Branch permitting the poll to be conducted using state resources. However, this Court has not yet determined whether the MJA polling of judges constitutes "judicial misconduct" or an improper use of state resources; that issue implicates the scope and legitimacy of the legislative subpoenas and is directly at issue in this case. The Legislature concedes that the subpoenas issued to the justices raise "the same or similar issues presented in McLaughlin's Petition . . . ." This representation and others made in the Legislature's pleadings, letters, and subpoenas make abundantly clear that the Legislature's investigation is directed to the *Judicial Branch as a whole*, and, therefore, includes *every judicial officer employed in the Judicial Branch*. Thus, the scope of the

7

Legislature's authority when issuing subpoenas to judicial officers for judicial electronic communications implicates the potential interests of *every* judge in Montana—district judges, water court judges, worker's compensation court judges, limited jurisdiction judges, and justices.

¶9 Second, the Legislature argues the "Court should not presume to self-adjudicate the limits of that investigation" and that we are "umpiring [our] own game" in a case in which we "are not parties." However, none of the justices are parties to this case or any other pending litigation involving the scope of the Legislature's subpoena power,[2] and this case does not involve adjudication of any subpoena issued to a member of this Court. Nonetheless, the Legislature relies on § 3-1-803, MCA, to assert a justice must recuse himself or herself in any proceeding "to which he is a *party*, or in which he is *interested . . .*," and argues due process does not allow a judge to be a judge in his own case (emphasis added). There are no cases in which any of the justices sitting on this case are *parties*; nor has there been established, with respect to any justice, any *interest* in the outcome of this litigation, apart from each justice being a member of the Judicial Branch and the MJA. However, that fact would disqualify every judge in Montana. Moreover, no suggestion has been made that any justice presiding over these proceedings would be unfair or partial in adjudicating the scope of legislative subpoena power in the context of Judicial Branch communications. The Legislature's unilateral act of issuing legislative

---

[2] The exception is Justice Jim Rice, who filed an individual proceeding in district court challenging the legislative subpoena issued to him. As noted, Justice Rice has recused himself from this proceeding.

subpoenas to the justices after this litigation was commenced does nothing to impugn the integrity, impartiality, and honesty in the justices serving as adjudicators. Once this issue is decided, the Judicial Branch and its members will be able to adjudicate related issues respecting-legislative subpoenas in the district courts and on appeal.

¶10 Third, Counsel for the Legislature argues this Court cannot preside over a case involving the Court Administrator. It maintains that McLaughlin's purported "efforts to prevent disclosure of this Court's records" equate to this Court being unable to maintain its impartiality. However, Montana judges have in the past presided over cases where the Court Administrator has been a party, without a conflict of interest. *See State v. Berdahl,* 2017 MT 26, 386 Mont. 281, 389 P.3d 254; *Boe v. Court Adm'r for the Mont. Judicial Branch of Pers. Plan & Policies,* 2007 MT 7, 335 Mont. 228, 150 P.3d 927. In this case, the Court is called upon to assess, for the first time, the appropriate scope of the legislative subpoena power in Montana—not to judge the conduct of McLaughlin. Importantly, if the Court were to adopt the Legislature's argument, then Judicial Branch officers and employees, as well as parties seeking relief from their actions, would be denied access to justice, and their interests in having their rights vindicated would be frustrated in every court in Montana. Accordingly, the Legislature's argument runs afoul of Article II, Section 16, of the Montana Constitution, which guarantees, as a fundamental right, that "[c]ourts of justice shall be open to every person . . . and that no person should be deprived of this full legal redress for injury incurred in employment . . . ." The Legislature's position that it will be the arbiter of the scope and purpose of its own subpoenas effectively abrogates Article II, Section 16.

9

¶11 Fourth, conspicuously absent from the Legislature's motion is any specific allegation or assertion of actual bias on the part of a justice. The Legislature has not alleged that a member of this Court has an actual bias, prejudice, or is otherwise unable to adjudicate these proceedings fairly and impartially. The Legislature's unilateral attempt to manufacture a conflict by issuing subpoenas to the entire Montana Supreme Court must be seen for what it is. Much of the same information the Legislature subpoenaed from the justices after this case was filed is being requested in the subpoena issued to McLaughlin; the Legislature has conceded this point. Thus, once the issues determining purpose and scope of legislative subpoena authority are adjudicated, the Legislature can acquire those documents through McLaughlin's subpoena. The Legislature's blanket request to disqualify all members of this Court appears directed to disrupt the normal process of a tribunal whose function is to adjudicate the underlying dispute consistent with the law, the constitution, and due process. Importantly, each justice has made abundantly clear, on several occasions, that they did not participate in the activity that is the primary subject of the Legislature's investigation—the poll conducted by the MJA.

¶12 This is not the first time legislators have moved to disqualify justices in cases where the Court will decide the constitutionality of their legislation or actions. In *Reichert v. State*, 2012 MT 111, 365 Mont. 92, 278 P.3d 455, voters brought an action against the Montana Secretary of State seeking to have Legislative Referendum 119, which addressed statutory changes regarding the election of justices to the Montana Supreme Court, declared constitutionally defective and to enjoin the State from having it placed on the ballot. Seven legislators, who appeared as amici curiae, argued that non-retiring justices

10

of the Court should recuse themselves under the Due Process Clause and the Montana Code of Judicial Conduct, contending that they have an interest in the outcome of the case. As does the Legislature here, legislators in *Reichert* relied on *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), to argue that the non-retiring justices had an interest in the outcome of the case, requiring their disqualification. We concluded that the justices' interest in being reelected by statewide election did not arise to the level of a constitutional due process violation as in *Caperton*. We noted that "the interest identified by Legislators as necessitating recusal is not exclusive to the four not-presently-retiring justices." *Reichert*, ¶ 37. We explained in the event of a justices' disqualification, a district judge would be appointed. "A district judge, however, has 'the potential' to run for a seat on this Court in the future, 'could possibly' be prevented by LR-119 from getting elected, and thus (under Legislator's theory) has an 'interest' in the outcome of the case." *Reichert*, ¶ 37. Therefore, "[u]nder a logical extension of Legislator's argument, no judge in this state— indeed, no otherwise qualified person with 'the potential' to run for Supreme Court justice—could sit on this case." *Reichert*, ¶ 37. We applied the Rule of Necessity to conclude none of the justices would be disqualified. *Reichert*, ¶ 37.

¶13 In the case of disqualification generally, when an individual judge is disqualified from a particular case by reason of §§ 3-1-803 and 3-1-805, MCA, the disqualified judge simply steps down and allows the normal administrative process of the court to assign the

11

case to another judge not disqualified.[3]  In the highly unusual circumstances of this case, all Montana judges have an interest in the outcome of this case since it involves an investigation into alleged judicial misconduct of the Judicial Branch and the polling procedures of an entity in which every judge and justice in Montana is a member and from which they receive e-mails.  It was precisely considerations of this kind that gave rise to the Rule of Necessity, a well-settled principle at common law that had its genesis at least five and a half centuries ago.  Its earliest invocation was in 1430, when it was held that the Chancellor of Oxford could act as judge of a case in which he was a party when there was no provision for appointment of another judge.  Rolle's Abridgment summarized this holding as follows: "[i]f an action is sued in the bench against all the Judges there, then by necessity they shall be their own Judges."  2 H. Rolle, *An Abridgment of Many Cases and Resolutions at Common Law* 93 (1668) (translation).

¶14   When the matter to be decided affects the interests of every judge qualified to hear it, the Rule of Necessity applies without resort to further factual development. *State ex rel. Hash v. McGraw*, 376 S.E.2d 634, 639 (W. Va. 1988).  The theory on which the Rule rests when such circumstances arise is that "where all are disqualified, none are disqualified." *Ignacio v. Judges of U.S. Court of Appeals for Ninth Circuit*, 453 F.3d 1160, 1165 (9th Cir. 2006) (*quoting Pilla v. Am. Bar Ass'n.*, 542 F.2d 56, 59 (8th Cir. 1976)) (applying the Rule because a litigant sued all the judges in a federal circuit); *see Bd. of Trs.*

---

[3] Section 3-1-803, MCA, applies to all judges, including justices, in Montana.  In contrast, § 3-1-805, MCA, which provides a procedure for adjudicating challenges for cause does not apply to justices.

12

*v. Hill*, 472 N.E.2d 204, 206 (Ind. 1985) (applying the Rule to consider a challenge to a statutory amendment affecting judicial retirement benefits); *see also Weinstock v. Holden*, 995 S.W.2d 408, 410 (Mo. 1999) (applying the rule to consider a resolution affecting judicial pay). Courts ordinarily invoke the Rule of Necessity in such circumstances because disqualifying every judge with an interest to be decided would leave the parties with no court in which to resolve the dispute. The common law tradition has "long regarded the absence of an appropriate forum in which to resolve a legitimate case to be intolerable." *Hill*, 472 N.E.2d at 206. The Rule of Necessity thus reflects the longstanding principle that to deny an individual access to courts for vindication of his or her rights constitutes a far more egregious wrong than to permit a judge to hear a matter in which he or she has some interest. *See Weinstock*, 995 S.W.2d at 410. Thus, implicit in the Rule is the concept of the absolute duty of judges to hear and decide cases within their jurisdiction and that "actual disqualification of a member of a court of last resort will not excuse such member from performing his official duty if failure to do so would result in denial of a litigant's constitutional right to have a question, properly presented to such court, adjudicated." *United States v. Wills*, 449 U.S. 200, 214 (1980) (quoting *State ex rel. Mitchell v. Sage Stores Co.*, 143 P.2d 652, 656 (Kan. 1943)).

¶15 Here, the Legislature's investigation into alleged misconduct of the Judicial Branch and the polling practices of the MJA is an investigation of every judge of this State. Because of the expansive and overarching nature of the Legislature's investigation into the Judicial Branch of government, no Montana judge is free of a disqualifying interest and, thus, this Court is required to invoke the Rule of Necessity; where "all judges are

13

disqualified, none are disqualified." *Ignacio*, 453 F.3d at 1165. In reaching this conclusion, we are mindful of Montana Code of Judicial Conduct 2.7, which states: "A judge shall hear and decide matters assigned to the judge, except when disqualification is required by Rule 2.12 or other law." The comment to this Rule explains:

> Although there are times when disqualification is necessary to protect the rights of litigants and preserve public confidence in the independence, integrity, and impartiality of the judiciary, judges must be available to decide matters that come before the courts. Unwarranted disqualification may bring public disfavor to the court and to the judge personally. The dignity of the court, the judge's respect for fulfillment of judicial duties, and a proper concern for the burdens that may be imposed upon the judge's colleagues require that a judge not use disqualification to avoid cases that present difficult, controversial, or unpopular issues.

M. C. Jud. Cond. 2.7 cmt [1]. Were we to grant the Legislature's request to disqualify every member of Montana's highest court on an issue involving co-equal branches of government and principles of separation of powers, the Court's ability to fulfill its constitutional duties to adjudicate difficult and controversial matters would be compromised. *See Larson v. State*, 2019 MT 28, ¶ 42, 394 Mont. 167, 434 P.3d 241 (noting exclusive constitutional duty and authority of this Court to "adjudicate the nature, meaning, and extent of applicable constitutional, statutory, and common law and to render appropriate judgments thereon . . . .") (citing Mont. Const. arts. III, § 1, and VII, § 1, *inter alia*; *Best v. City of Billings Police* Dep't, 2000 MT 97, ¶ 16, 299 Mont. 247, 999 P.2d 334 (among the three coordinate branches of a constitutional government "it is the province and duty of the judiciary 'to say what the law is'") (citing *Marbury v. Madison*, 5 U.S. 137, 177 (1803) (the constitution is the "fundamental and paramount law" and the fundamental "theory of every such [constitutional] government" is "that an act of

14

the legislature, repugnant to the constitution, is void. . . . It is emphatically the province and duty of the judicial department to say what the law is" and "of necessity [to] expound and interpret that rule" to resolve any conflict of law)).

¶16 Finally, and perhaps most importantly, we would be remiss in our analysis of the Legislature's disqualification request, if we did not consider the context in which it has been made. The Legislature has unilaterally attempted to create a disqualifying conflict for every duly constituted and elected member of this Court, during the pendency of a proceeding before the Court, by issuing a subpoena to every presiding justice in the case which is nearly identical to the subject of the litigation—McLaughlin's subpoena. It is well recognized that a party's unilateral acts personally attacking or suing the judge for acts taken in his or her judicial capacity do not create a proper basis for recusal. Recusal under such circumstances would permit a party to avoid a particular judge simply by attacking or suing him. *See United States v. Studley*, 783 F.2d 934, 940 (9th Cir. 1986); *see also United States v. Grismore*, 564 F.2d 929, 933 (10th Cir. 1977); *see also United States v. Whitesel*, 543 F.2d 1176, 1181 (6th Cir. 1976). Here, the Legislature itself has created the conflict by issuing a subpoena to each justice during a pending proceeding involving the same issues raised in a legislative subpoena. The Legislature's unilateral act of issuing subpoenas to the justices during the pendency of this case is not ground for recusal of every member of this Court. A judge is required to act in a manner that promotes "public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." M. C. Jud. Cond. 1.2. Were the Court to succumb to the Legislature's request and evade our responsibilities and

15

obligations as a Court, we are convinced that public confidence in our integrity, honesty, leadership, and ability to function as the highest court of this State would be compromised.

¶17 IT IS HEREBY ORDERED that the Legislature's Motion to Disqualify the justices of the Court is DENIED.

DATED this 12th day of May, 2021.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR
/S/ DONALD HARRIS
Hon. Donald Harris, District Judge,
sitting by designation