FILED

07/14/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: OP 21-0173

OP 21-0173

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 178

BETH McLAUGHLIN,

        Petitioner,

  v.

The MONTANA STATE LEGISLATURE,
and the MONTANA DEPARTMENT OF
ADMINISTRATION,

        Respondents.

ORIGINAL PROCEEDING:      Petition for Original Jurisdiction

COUNSEL OF RECORD:

        For Petitioner:

            Randy J. Cox, Boone Karlberg P.C., Missoula, Montana

        For Respondent Montana State Legislature:

            Austin Knudsen, Montana Attorney General, Kristin Hansen, Lieutenant General, Derek J. Oestreicher, General Counsel, Helena, Montana

        For Respondent Montana Department of Administration:

            Michael P. Manion, Department of Administration, Helena, Montana

            Dale Schowengerdt, Crowley Fleck PLLP, Helena, Montana

                        Decided:  July 14, 2021

Filed:

                    _____
                           Clerk

Justice Beth Baker delivered the Opinion and Order of the Court.

¶1 Beth McLaughlin, Court Administrator for the Montana Judicial Branch, brought this original proceeding seeking to quash and permanently enjoin the enforcement of successive subpoenas the Montana Legislature issued, first to the Director of the State Department of Administration and later to McLaughlin, for the production of McLaughlin's e-mails between January 4 and April 12, 2021. The second subpoena also directed production of McLaughlin's state-owned computers and telephones used to facilitate polling of state judges. At our request, both Respondents have submitted summary responses in accordance with M. R. App. P. 14(7). The Legislature also filed a motion to dismiss, which McLaughlin opposes. We considered all parties' submissions and relevant legal authorities and submitted the matter for decision on May 26, 2021.[1]

¶2 Acknowledging the Legislature's authority to obtain information in the exercise of its legislative functions under the Montana Constitution, we conclude that the subpoenas in question are impermissibly overbroad and exceed the scope of legislative authority because they seek information not related to a valid legislative purpose, information that is confidential by law, and information in which third parties have a constitutionally protected individual privacy interest. We hold further that, if the Legislature subpoenas records from a state officer like the Court Administrator auxiliary to its legislative

---

[1] On June 22, 2021, Legislative leadership notified both McLaughlin and Department of Administration Director Misty Ann Giles by letter that the Legislature had withdrawn the subject subpoenas. The Legislature then moved to dismiss this action as moot. McLaughlin opposed the motion. On June 29, this Court denied the motion because it did not address documents already in the Legislature's possession and the issues the withdrawn subpoenas raised fall within the public interest and voluntary cessation exceptions to mootness.

2

function, whether those records be in electronic or other form, a Montana court—not the Legislature—must conduct any needed *in camera* review and balance competing privacy and security interests to determine whether records should be redacted prior to disclosure.

**PROCEDURAL AND FACTUAL BACKGROUND**

¶3 We described the events giving rise to this proceeding in our May 12, 2021 Opinion and Order. *McLaughlin v. Montana State Legislature*, 2021 MT 120, 404 Mont. 166, ___ P.3d ___ (*McLaughlin I*). Briefly summarized, the Montana Legislature asked McLaughlin to provide information on a poll she facilitated of the Montana Judges Association pertaining to Senate Bill 140, a bill then under consideration by the Legislature. She responded to the request but had not retained and did not provide narrative responses that some of the judges had included. Under an unsigned April 8, 2021 subpoena from the Chair of the Senate Judiciary Committee, the Legislature directed Montana Department of Administration Director Misty Ann Giles to appear the following afternoon and produce without subject matter limitation "[a]ll emails and attachments sent and received by Court Administrator Beth McLaughlin between January 4, 2021 and April 8, 2021." The Subpoena also requested "[a]ny and all recoverable deleted emails" McLaughlin sent or received during the same time period. The subpoena excluded only "any emails and attachments related to decisions made by the justices in disposition of final opinion." The subpoena did not identify the purpose or subject of the inquiry. Though not served, McLaughlin learned of the subpoena when she received a "courtesy copy" late afternoon on April 9, 2021. By that time, Director Giles already had provided several thousand pages of e-mail messages to the Legislature.

3

¶4   McLaughlin commenced this proceeding on April 12, the day after we issued a temporary order to stop further production until the issues could be reviewed following response from the Legislature and the Department. Two days later, through a subpoena signed by the Senate President and Speaker of the House of Representatives, the Legislature directed McLaughlin to appear the following Monday and to produce:

> (1) All emails and attachments sent and received by your government e-mail account, [redacted], including recoverable deleted emails, between January 4, 2021, and April 12, 2021 delivered as hard copies and .pst digital files.
> (2) Any and all laptops, desktops, hard-drives, or telephones owned by the State of Montana which were utilized in facilitating polls or votes with Montana Judges and Justices regarding legislation or issues that may come or have come before Montana courts for decision.

The subpoena advised that it "excludes any emails, documents, and information related to decisions made by Montana justices or judges in the disposition of any final opinion or any decisional case-related matters." It stated further that "[a]ny personal, confidential, or protected documents or information responsive to this request will be redacted and not subject to public disclosure." McLaughlin filed a motion in this proceeding to quash the second subpoena as well; we temporarily enjoined its enforcement pending further proceedings in this matter.

**STANDARDS OF REVIEW**

¶5   This is an original proceeding seeking interpretation of statutory and constitutional provisions. This Court exercises plenary authority in the construction and application of the Montana Constitution and statutes. *In re Engel*, 2008 MT 215, ¶ 4, 344 Mont. 219, 194 P.3d 613 (citing *State v. Racz*, 2007 MT 244, ¶ 13, 339 Mont. 218, 168 P.3d 685).

4

"Whether an issue presents a non-justiciable political question is a legal conclusion that this Court reviews de novo." *Columbia Falls Elementary Sch. Dist. No. 6 v. State*, 2005 MT 69, ¶ 12, 326 Mont. 304, 109 P.3d 257; *see also Larson v. State*, 2019 MT 28, ¶ 16, 394 Mont. 167, 434 P.3d 241; *Reichert v. State*, 2012 MT 111, ¶ 20, 365 Mont. 92, 278 P.3d 455.

## DISCUSSION

### *Legislative Power to Investigate*

¶6     The Montana Constitution divides the power of government "into three distinct branches—legislative, executive, and judicial."   Mont. Const. art. III, § 1. "The legislative power is vested in a legislature consisting of a senate and a house of representatives."   Mont. Const. art. V, § 1.   Like the United States Constitution, Montana's Constitution contains "no enumerated constitutional power [in the Legislature] to conduct investigations or issue subpoenas," but it is well-established that a legislative body "has power 'to secure needed information' in order to legislate." *Trump v. Mazars USA, LLP*, ___ U.S. ___, 140 S. Ct. 2019, 2031 (2020) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 161, 47 S. Ct. 319, 324 (1927)).   "This 'power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function.'" *Mazars*, 140 S. Ct. at 2031 (quoting *McGrain*, 273 U.S. at 174, 47 S. Ct. at 328); *see also* 43 Mont. Op. Att'y Gen. 60 at 222 (1990) ("The legislative power described by Article V, section 1 of the Montana Constitution contains the inherent power of investigation.").   "This has been recognized from the earliest times in the history of U.S. legislation, both federal and state, and from even earlier epochs in the

5

development of British jurisprudence." Mason's Manual of Legislative Procedure (2010 ed.), § 795.1 at 561.

¶7 The Montana Legislature has by statute set forth its authority to issue subpoenas "requiring the attendance of any witness before either house of the legislature or a committee of either house" and the requisite form of the subpoenas so issued. Section 5-5-101, MCA. A witness subpoenaed by the Legislature "cannot refuse to testify to any fact or to produce any paper concerning which the witness is examined for the reason that the witness's testimony or the production of the paper tends to disgrace the witness or render the witness infamous." Section 5-5-105(2), MCA.[2] *See also* § 5-11-107, MCA (providing that a statutory or interim committee of the legislature "may hold hearings, administer oaths, issue subpoenas, compel the attendance of witnesses and the production of papers, books, accounts, documents, and testimony, and cause depositions of witnesses to be taken in the manner prescribed by law for taking depositions in civil actions in district court" and allowing enforcement of the same by "the district court of any county[.]").

---

[2] Both subpoenas at issue invoke Title 5, Chapter 5, part 1, MCA, for their authority. This law extends the subpoena power to the "attendance of [a] witness" but does not expressly authorize the Legislature to subpoena documents. Section 5-5-101, MCA. We held recently that a similar statute concerning investigative authority of the Commissioner of Political Practices did not permit the Commissioner to subpoena the production of documents; instead, the Commissioner had to seek documents through compulsory process issued by a court. *Comm'r of Political Practices for Mont. v. Mont. Republican Party*, 2021 MT 99, ¶ 11, 404 Mont. 80, 485 P.3d 741. That case, however, involved an executive branch agency created by statute and vested with only those powers the Legislature confers. *See generally Core-Mark Int'l, Inc. v. Mont. Bd. of Livestock*, 2014 MT 197, ¶ 45, 376 Mont. 25, 329 P.3d 1278. Because the Legislature now asserts a constitutional basis for its subpoena power in addition to the statutory basis it cited in the subpoenas, we do not rely on our decision in *Mont. Republican Party* in resolving the questions at issue here.

¶8 A legislature's "power to obtain information is 'broad' and 'indispensable.'" *Mazars*, 140 S. Ct. at 2031. Courts generally must indulge a presumption that the legislative activity has as its object a legitimate goal toward possible legislation, *McGrain*, 287 U.S. at 178-79, 47 S. Ct. at 330. But the Legislature's investigative power, broad as it is, "is not unlimited." *Mazars*, 140 S. Ct. at 2031; *Watkins v. U.S.*, 354 U.S. 178, 187, 77 S. Ct. 1173, 1179 (1957). The Supreme Court has stated,

> Congress may only investigate into those areas in which it may potentially legislate or appropriate, it cannot inquire into matters which are within the exclusive province of one of the other branches of the Government. Lacking the judicial power given to the Judiciary, it cannot inquire into matters that are exclusively the concern of the Judiciary. Neither can it supplant the Executive in what exclusively belongs to the Executive.

*Barenblatt v. United States*, 360 U.S. 109, 111-12, 79 S. Ct. 1081, 1085 (1959).

¶9 The legislative branch is not a law enforcement agency; its inquiry "must be related to, and in furtherance of, a legitimate task of the [Legislature]." *Watkins*, 534 U.S. at 187, 77 S. Ct. at 1179. To serve a "valid legislative purpose," the subpoena "must 'concern[] a subject on which legislation "could be had."'" *Mazars*, 140 S. Ct. at 2031 (quoting *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 506, 95 S. Ct. 1813, 1823 (1975)). "The investigatory power of a legislative body is limited to obtaining information on matters that fall within its proper field of legislative action." Mason's Manual of Leg. Procedure, § 797.7 at 567. "Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Watkins*, 354 U.S. at 178, 77 S. Ct. at 1179. And

7

"'there is no congressional power to expose for the sake of exposure.'" *Mazars*, 140 S. Ct. at 2032 (quoting *Watkins*, 354 U.S. at 200, 77 S. Ct. at 1185).

¶10 In *Mazars*, the Court examined Congressional subpoenas seeking the President's information under the lens of separation of powers, announcing a non-exhaustive series of safeguards—in contrast to the generally applicable presumption stated in *McGrain*—when the legislative subpoena authority is directed at another branch of government. "First, courts should carefully assess whether the asserted legislative purpose warrants the significant step" of issuing the subpoena, because "occasion[s] for constitutional confrontation between the two branches should be avoided whenever possible." *Mazars*, 140 S. Ct. at 2035 (citation, internal quotations omitted). In this regard, the legislative body may not compel information from a coequal branch of government "if other sources could reasonably provide" the information necessary for "its particular legislative objective." *Mazars*, 140 S. Ct. at 2035-36.

¶11 Second, "to narrow the scope of possible conflict between the branches," the subpoena must be "no broader than reasonably necessary to support [the] legislative objective." *Mazars*, 140 S. Ct. at 2036.

¶12 Third, courts must examine the asserted legislative purpose and the "nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose." *Mazars*, 140 S. Ct. at 2036. The legislative body must "adequately identif[y] its aims and explai[n] why the [requested] information will advance its consideration of the possible legislation." *Mazars*, 140 S. Ct. at 2036. "[D]etailed and substantial . . . evidence of . . . legislative purpose" is "particularly" important when the

8

legislative body "contemplates legislation that raises sensitive constitutional issues, such as legislation concerning the Presidency" or—in this case—the Judiciary. *Mazars*, 140 S. Ct. at 2036.

¶13 Finally, in the context of considering the burden an interbranch subpoena imposes, courts must "carefully scrutinize[]" such subpoenas, "for they stem from a rival political branch" with "incentives to use subpoenas for institutional advantage." *Mazars*, 140 S. Ct. at 2036.

### *Justiciability of the Controversy*

¶14 With these principles in mind, we turn first to the Legislature's first Motion to Dismiss. The Motion makes three points, which in the aggregate argue that the case does not present a justiciable controversy as the matter is vested exclusively with the Legislature and, because the subpoenas pertain to the Judicial Branch, the Court has an insurmountable conflict of interest that requires it to refrain from adjudicating the dispute. The Legislature concludes that this Court "must refuse to further interfere with a duly authorized legislative investigation" and "has no authority but to dismiss this Petition." McLaughlin responds that in the constitutional system of checks and balances, implemented through Montana statutes and rules, the Legislature enacts statutes, the legislative subpoena power must be "adjunct to the legislative process," and the judiciary determines the permissible scope and enforcement of subpoenas.

¶15 We addressed the conflict-of-interest argument in our Opinion and Order denying the Legislature's motion to disqualify the members of this Court from presiding in this proceeding. *McLaughlin I*, ¶¶ 10-14. We do not address it further.

9

¶16    We touched also in that opinion on the justiciability issue, noting the "exclusive constitutional duty and authority of this Court to 'adjudicate the nature, meaning, and extent of applicable constitutional, statutory, and common law and to render appropriate judgments thereon[.]'" *McLaughlin I*, ¶ 15 (quoting *Larson v. State*, 2019 MT 28, ¶ 42, 394 Mont. 167, 434 P.3d 241 (citing Mont. Const. arts. III, § 1, and VII, § 1)).    The Legislature takes issue with the applicability of this principle, maintaining that when the judicial branch of government is itself the subject of the Legislature's action, the conflict is one directly between the branches of government and must be handled exclusively through negotiation between the branches.

¶17    The judiciary has an unflagging responsibility to decide cases and controversies, even those that involve the authority of a coordinate branch of government or the courts' own functions.  *See Coate v. Omholt*, 203 Mont. 488, 662 P.2d 591 (1983) (declaring unconstitutional two statutes that directed the State Auditor to withhold a month's pay from district court judges and supreme court justices if decisions were not reached or opinions written within certain procedural and time constraints set by statute); *see also Gabler v. Crime Victims Rights Bd.*, 897 N.W.2d 384, 386 (Wis. 2017) (Wisconsin Supreme Court declaring unconstitutional a law authorizing a special executive branch board to investigate and adjudicate complaints against the judiciary, including the ability to seek equitable relief and forfeiture against judges); *State ex rel. Kostas v. Johnson*, 69 N.E.2d 592, 595 (Ind. 1946) ("A court of general jurisdiction, whether named in the Constitution or established in pursuance of the provisions of the Constitution, cannot be directed, controlled, or impeded in its functions by any of the other departments of the

10

government.  The security of human rights and safety of free institutions require the absolute integrity and freedom of action of courts.") (citation omitted).  Though not a frequent subject of litigation, disputes over the scope of legislative subpoena power are squarely within the authority of the courts.  *See, e.g.*, *Mazars*, *Eastland*, *McGrain*, *Watkins*.

¶18    What is more, this Court on several occasions has been called upon to resolve disputes about its own authority.  *See, e.g.*, *Matter of McCabe*, 168 Mont. 334, 544 P.2d 825 (1975) (holding that the Supreme Court, not the Legislature, had authority to set standards for admission to the bar and conduct of members of the bar); *Goetz v. Harrison*, 154 Mont. 274, 462 P.2d 891 (1969) (entertaining an original proceeding filed against all members of the Supreme Court to determine the constitutionality of the Montana statutory "diploma privilege" for admission to the bar and to consider the Court's corresponding rule under its "exclusive" and "inherent jurisdiction, in all matters involving admission of persons to practice law in this state").  Even when a constitutional provision is non-self-executing because it commits authority to the Legislature, "the courts, as final interpreters of the Constitution, have the final 'obligation to guard, enforce, and protect every right granted or secured by the Constitution . . . .'" *Columbia Falls Elem. Sch. Dist. No. 6 v. State*, 2005 MT 69, ¶ 18, 326 Mont. 304, 109 P.3d 257 (quoting *Robb v. Connolly*, 111 U.S. 624, 637, 4 S. Ct. 544, 551 (1884)).  *See also Brown v. Gianforte*, 2021 MT 149, ¶ 23, 404 Mont. 269, ___ P.3d ___ (citing *Columbia Falls Elem. Sch. Dist. No. 6*, ¶ 18) and ¶ 56 (Rice, J., concurring) (observing that, "since the early 1800s, 'the idea that the

11

Supreme Court had the power to pass upon constitutional questions and that its decisions were final and binding upon the other two departments of government ha[s] been . . . widely accepted'") (citation omitted); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60, 73 (1803) ("It is emphatically the province and the duty of the judicial department to say what the law is.").

¶19    The Legislature cites *Mazars* and other federal cases for the proposition that "negotiation and compromise" are the singular path for resolving conflicts in subpoena matters between branches of government.  To be sure, an "interbranch conflict" presented by a legislative subpoena "implicate[s] weighty concerns regarding the separation of powers." *Mazars*, 140 S. Ct. at 2035.  The cited authority does not, however, support the Legislature's position that there can be no judicial solution when a controversy involves legislative subpoenas to a judicial branch official.  The Supreme Court's decisions on Congressional subpoenas make clear that the courts have a role regardless of the office or the government stature of the subject to whom the subpoena pertains.  *E.g.*, *Mazars*, 140 S. Ct. at 2035 ("[S]eparation of powers concerns are no less palpable here simply because the subpoenas were issued to third parties.  Congressional demands for the President's information present an interbranch conflict no matter where the information is held.").  The *Mazars* Court harkened the two-century tradition of the political branches "resolv[ing] information disputes using the wide variety of means that the Constitution puts at their disposal." *Mazars*, 140 S. Ct. at 2035.  But it did so in preface to its prescription of the "balanced approach" the courts must take when the branches reach impasse, accounting for "both the significant legislative interests of Congress and the

12

'unique position' of [in that case] the President." *Mazars*, 140 S. Ct. at 2035. The "practice of the government" to avoid such interbranch confrontation informs the courts' consideration of the controversy but does not abrogate their obligation to decide it. Although the *Mazars* Court examined Congressional subpoenas to the Executive, its articulated "balanced approach" extends logically to subpoenas to the judicial branch, which raise similar "interbranch confrontation" concerns.

### *Legislative Purpose and Scope of Subpoenas*

¶20    We accordingly turn to the merits of the controversy presented, whether the stated legislative purposes of the subpoenas for the Court Administrator's records are "related to, and in furtherance of, a legitimate task of the [Legislature]," *Watkins*, 354 U.S. at 187, 77 S. Ct. at 1179, and whether, consistent with the separate powers the Constitution confers on each branch, the subpoenas seek only information within the scope of such a task.

¶21    We look to the purposes the Legislature identifies.[3] The April 8 subpoena to Director Giles did not identify any purpose for which the subpoena was issued. The April 14 subpoena to McLaughlin stated:

> This request pertains to the Legislature's investigation into whether members of the Judiciary or employees of the Judicial Branch deleted public records and information in violation of state law and policy; and whether the current policies and processes of the Judicial Standards Commission are sufficient to address the serious nature of polling members

---

[3] The Department of Administration takes no position on the legal issues raised in this case but offers a proposed framework for identifying potential exclusions and redactions and its assurance that it "will await an order from the Court before releasing any documents in response to the subpoenas."

13

of the Judiciary to prejudge legislation and issues which have come and will come before the courts for decision.

In its Response to Petition for Original Jurisdiction, the Legislature provided the following purpose behind seeking McLaughlin's records:

> The purpose of the Select Committee is to investigate and determine whether legislation should be enacted concerning: the judicial branch's public information and records retention protocols; members of the judicial branch improperly using government time and resources to lobby on behalf of a private entity; judges' and justices' statements on legislation creating judicial bias; and the courts' conflict of interest in hearing these matters.

Finally, the Legislature's Motion to Dismiss contains this list of its identified purposes:

> an investigation into whether members of the Judiciary and the Court Administrator have deleted public records and information in violation of state law and policy; whether the Court Administrator has performed tasks for the Montana Judges Association during taxpayer funded worktime in violation of law and policy; and whether current policies and processes of the Judicial Standards Commission are sufficient to address the serious nature of polling members of the Judiciary to prejudge legislation and issues which have come and will come before courts for decision.

We distill these variously stated purposes to three principal categories: (1) the Judicial Branch's records retention policy and practices; (2) the Court Administrator's use of state e-mail to communicate with judges and the Montana Judges Association about matters pending before the Legislature; and (3) the statements and conduct of members of the judiciary.

¶22 Records Retention

¶23 We address the asserted legislative purpose relating to judicial records retention first.

14

¶24    The subpoenas' proffered legislative purpose here is problematic.  For one, though it reframed the purpose after McLaughlin filed this action, the Legislature indicated in the April 14 subpoena to McLaughlin that it sought "investigation into whether members of the Judiciary or employees of the Judicial Branch deleted public records and information in violation of state law and policy."  Addressing alleged violations of existing law is an enforcement matter entrusted to the executive, not to the legislative, branch of government; it is therefore not a valid legislative purpose.  *Watkins*, 354 U.S. at 187, 77 S. Ct. at 1179 (holding that the legislative branch is not "a law enforcement or trial agency" as those "are functions of the executive and judicial departments").

¶25    Relying on a legislative interest relating to judicial branch records retention is further troubling in light of the *Mazars* considerations.  *Mazars* directs us to examine the "nature of the evidence" establishing that the subpoena advances the purported legislative purpose.  *Mazars*, 140 S. Ct. at 2036.  The Legislature points to evidence that the Court Administrator did not retain access to the e-mails later sought through the Department of Administration.  This is not, however, a "violation of state law and policy," as the subpoenas allege.

¶26    Montana statutes address the management of public records and public information by public officers and agencies, which include the judicial branch of state government.  Sections 2-6-1001 (purpose of public records chapter), 2-6-1002(10) (defining "public agency"), 2-6-1002(12) (defining "public officer"), MCA.  The statute defines "public record" as:

    public information that is:

(a) fixed in any medium and is retrievable in usable form for future reference; and
(b) designated for retention by the state records committee, judicial branch, legislative branch, or local government records committee.

Section 2-6-1002(13), MCA. "Public information" does not include "confidential information that must be protected against public disclosure under applicable law." Section 2-6-1002(11), MCA.

¶27 Section 2-6-1012(1)(e), MCA, requires the Judicial Branch to establish a records management plan.[4] The office of the Clerk of Court, an independent elected position, maintains Judicial Branch records, as designated by law. Section 3-2-402(1)(a), MCA. Current Judicial Branch policies do not require Judicial Branch members to save e-mails or retain access to their electronic communications. *See* Montana Judicial Branch Administrative Policies 1530, Electronic Mail (Effective July 1, 2002); Montana Judicial Branch Administrative Policies 1510, Computer Use (Effective June 6, 2017) (both available at https://courts.mt.gov/cao/CourtServices/hr/policies) (last accessed 7/7/2021). As Judicial Branch e-mail messages are not "designated for retention by the . . . judicial branch," § 2-6-1002(13)(b), MCA, its records management plan, § 2-6-1012(1)(e), MCA, or any other provision, their retention is not required by statute or administrative policy

---

[4] Unlike the legislative branch, the statute allows—but does not require—the Judicial Branch to seek assistance with the plan from "the secretary of state, the state records committee, the local government records committee, and the Montana historical society." Section 2-6-1012(1)(e), MCA. The Judicial Branch 8th Information Technology Strategic Plan, adopted by its Commission on Technology on November 5, 2020, includes among its objectives to "[r]eview and develop retention policies and procedures for electronic work products based on best practices." 2021 Goal 1, Objective 1.c. at 9. https://courts.mt.gov/external/cao/docs/it-strategic-plan.pdf (https://perma.cc/2U7J-K6GC) (last accessed 7/7/2021).

and neither McLaughlin nor any other Judicial Branch member was required by state law or policy to retain access to e-mail messages.

¶28 The Legislature unquestionably may seek data from the court administrator "relating to the business transacted by the courts." Section 3-1-702(2), MCA. In light of the statutes and Judicial Branch policies explained above, however, the Legislature has not "adequately identif[ied] its aims and explain[ed]" the connection between the subject of its investigation—alleged violations of state law and policy—and the evidence offered—unretained e-mails. Investigating potential violation of unspecified state law or policy is not a valid legislative purpose to justify the subpoenas. *Mazars*, 140 S. Ct. at 2036 (citing *Watkins*, 354 U.S. at 201, 205, 77 S. Ct. at 1186, 1188, as "preferring such [detailed and substantial] evidence over 'vague' and 'loosely worded' evidence of [legislative] purpose").

¶29 Importantly, "other sources could reasonably provide" information that would be relevant for understanding Judicial Branch records retention, such as the branch's publicly available e-mail policy, *see* Montana Judicial Branch Administrative Policies 1530, Electronic Mail (https://courts.mt.gov/cao/CourtServices/hr/policies) (effective July 1, 2002), public statements by members of the Judicial Branch, or inquiries to the relevant Judicial Branch and information technology staff. *See Mazars*, 140 S. Ct. at 2035-36. The Legislature has not suggested that the Judicial Branch's policies are not available to the public,[5] that its efforts to seek information on Judicial Branch policy and

---

[5] *See* https://courts.mt.gov/cao/CourtServices/hr/policies.

17

practice have been rebuffed, or that it is otherwise incapable of understanding Judicial Branch retention practices and policies without resorting to a subpoena of Judicial Branch electronic correspondence.

¶30 Neither has the Legislature—either in its subpoenas or in its representations offered in the course of litigation—"adequately identif[ied] its aims and explain[ed]" how the release of thousands of unredacted Judicial Branch e-mails will "advance its consideration" of possible legislation regarding records retention. *Mazars*, 140 S. Ct. at 2036. It is undisputed that, pursuant to Judicial Branch policy, branch members regularly clear correspondence from their computers, though the messages may be retained by the Department of Administration.[6] The Legislature also has not demonstrated that the subpoenas' blanket demands for the contents of every unretained message in the given time period is "no broader than reasonably necessary to support [a] legislative objective." *Mazars*, 140 S. Ct. at 2036.

¶31 We therefore conclude that the Legislature's first proffered legislative purpose—an investigation into Judicial Branch members' e-mail retention practices as an alleged violation of state law or policy—is not a legitimate purpose of the Legislative Branch of government. It is based on an unsubstantiated premise that Judicial Branch members are required to retain all e-mails and fails to show that compelling production of thousands of

---

[6] A significant amount of discussion about pending cases is conducted by e-mail and protected by judicial privilege. The State of Montana retains deleted messages within the Outlook system used by the Judicial Branch. However, once the "deleted items" box is emptied, these e-mails cannot be retrieved and must be obtained through a retrieval process by the Department of Administration. The Legislature's April 8 subpoena to Director Giles indicates its awareness of this process.

18

unredacted Judicial Branch messages, rather than undertaking other forms of inquiry, will advance its consideration of legislation on the matter of a judicial records retention policy. The Legislature's subpoenas cannot be supported by this alleged legislative purpose.

¶32 Use of State Resources to "Lobby"

¶33 The Legislature identifies a second legislative purpose in its response to the Petition as seeking to determine "whether the Court Administrator has performed tasks for the Montana Judges Association during taxpayer funded worktime in violation of law and policy" and "members of the judicial branch improperly using government time and resources to lobby on behalf of a private entity." This purpose was not expressed in either subpoena.

¶34 Montana long has had a statutory code of ethics governing the conduct of public officers and employees. *See* Tit. 2, ch. 2, pt. 1, MCA. "State officers" are defined under that code to include elected officers and directors of the executive—not of the legislative or judicial—branch of state government. Section 2-2-102(12), MCA. But all state employees, including those in the Judicial Branch, are included within the definition of "public employee." Section 2-2-102(7)(a), MCA ("any temporary or permanent employee of the state"). The code of ethics prohibits public employees from using public time or equipment for the "employee's private business purposes" or to support or oppose political committees, candidates, or ballot issues (with certain exceptions specified for the latter). Section 2-2-121(2)(a), (3), MCA. It also restricts public employees from "lobbying, as defined in 5-7-102, on behalf of an organization . . . of which the . . . public

19

employee is a member while performing the . . . public employee's job duties." Section 2-2-121(6), MCA. Executive branch officers—the Commissioner of Political Practices (Commissioner), the county attorneys, and the Attorney General—are responsible, respectively, for investigating and for enforcing a state employee's alleged violations of the ethics code. Once again, the Legislature has alleged a violation of existing law, investigation of which is not within the purview of that branch of government.

¶35 More, the "nature of the evidence" offered by the Legislature demonstrates that it has not "adequately identif[ied] its aims and explain[ed]" how the acts alleged would constitute a legal violation as the subpoena asserts. *Mazars*, 140 S. Ct. at 2036. Section 5-7-102(11)(b), MCA, excludes actions of public officials acting in their governmental capacities from the definition of "lobbying." As public officials acting in their governmental capacities, district court judges therefore are not "lobbying" when they inform members of the Legislature of how proposed legislation will affect the function of the Judicial Branch. The statute further excludes from the definition of "lobbyist" "an individual working for the same principal as a licensed lobbyist who does not have personal contact involving lobbying with a public official or the legislature on behalf of the principal." Section 5-7-102(12)(b)(ii), MCA. To the extent the court

20

administrator coordinates or facilitates district judges' contacts with legislators, her activity is not lobbying.[7]

¶36    To the same point, Judicial Branch policy does not prohibit these activities. Its E-mail Policy 2.2 prohibits use of "the state e-mail system for: 1) 'for-profit' activities, 2) 'non-profit' or public, professional or service organization *activities that aren't related to an employee's job duties*, or 3) extensive use for private, recreational, or personal activities." https://courts.mt.gov/cao/CourtServices/hr/policies (emphasis added). As the liaison between the Judicial Branch and the Legislature, the Court Administrator acts within her job duties when she coordinates contacts between district court judges and legislators or conducts a poll to allow district judges, through the Montana Judges Association, to provide the Legislature with relevant information regarding how proposed legislation will affect Judicial Branch functions. *See* § 3-1-702(10), MCA (providing that the Court Administrator's duties include those "that the supreme court may assign"). It is undisputed that members of coordinate branches, including elected officials, department heads, and other appointed officials, routinely respond to legislative requests on matters related to their department or branch. In that same vein, Rule 3.1 of the Montana Code of Judicial Conduct allows judges to use court "premises, staff, stationery, equipment, or other resources" for "incidental use for activities that concern the law, the legal system, or the administration of justice," because "[j]udges are uniquely qualified to engage in the

---

[7] The Montana Judges Association does register as a principal, and its registered lobbyist files lobbying reports of his activity before the Legislature. *See* https://lobbyist-ext.mt.gov/LobbyistRegistration/public/searchRegistry/home (last accessed 7/7/2021).

21

extrajudicial activities that concern" such matters. Mont. Code of Jud. Conduct 3.1 & Comment 1.

¶37 Because the Legislature has not articulated a legitimate legislative purpose related to lobbying and predicates it on an erroneous legal premise, this suggested purpose is insufficient to support the legislative subpoenas at issue.

¶38 Statements by Judges

¶39 The Legislature's third proffered legislative purpose supporting the subpoenas relates to the statements and conduct of members of the judiciary—in particular, the practice by district court judges of responding to polls used by the Montana Judges Association to determine whether to take a policy position on proposed legislation affecting the Judicial Branch. The Legislature suggests that such responses indicate improper judicial "bias" or what it terms "pre-judging" with regard to pending legislation that, if enacted and subsequently challenged in court, judges could potentially be asked to determine as a matter of constitutional law or statutory interpretation.

¶40 Article VII, section 11, of the Montana Constitution addresses the removal and discipline of judges. It provides in its entirety:

> (1) The legislature shall create a judicial standards commission consisting of five persons and provide for the appointment thereto of two district judges, one attorney, and two citizens who are neither judges nor attorneys.
>
> (2) The commission shall investigate complaints, and make rules implementing this section. It may subpoena witnesses and documents.
>
> (3) Upon recommendation of the commission, the supreme court may:
>
> (a) Retire any justice or judge for disability that seriously interferes with the performance of his duties and is or may become permanent; or

22

(b) Censure, suspend, or remove any justice or judge for willful misconduct in office, willful and persistent failure to perform his duties, violation of canons of judicial ethics adopted by the supreme court of the state of Montana, or habitual intemperance.

(4) The proceedings of the commission are confidential except as provided by statute.

Pursuant to this provision, the Legislature has provided for the Judicial Standards Commission and set staggered terms for its members. Sections 3-1-1101, -1102, MCA. Also in accordance with the limited authority conferred by this section, the Legislature has enacted statutes prescribing the confidentiality of the Commission's proceedings until the Commission finds good cause for a hearing on a complaint against a judge or the judge waives confidentiality. Sections 3-1-1121, -1122, MCA. The Commission must, on or before September 1 of each year preceding a regular legislative session, submit a report to the Legislature of complaints against judges, the status of the complaints, and all dispositions during the preceding biennium. Sections 3-1-1126, 5-11-210, MCA.

¶41 "The judicial power of the state is vested in one supreme court, district courts, justice courts, and such other courts as may be provided by law." Mont. Const. art. VII, § 1. The Constitution bestows the Supreme Court with general supervisory control over all other courts and vests authority in the Supreme Court for the discipline or removal from office of "any justice or judge." Mont. Const. art. VII, §§ 2(2), 11(3). Although the Legislature is required to establish the Judicial Standards Commission, Article VII, section 11, delegates implementation of its provisions to the Commission by rulemaking and confers upon the Legislature only the development of provisions regarding confidentiality of the Commission's proceedings. *Compare* Mont. Const. art. VII, § 8(2)

23

(providing for nominees for judicial vacancies to be selected broadly "in the manner provided by law"). *See Brown v. Gianforte*, 2021 MT 149, ¶ 32, 404 Mont. 269, ___ P.3d ___. To maintain the independence of the judiciary, the Constitution commits the oversight of judges to the judicial branch of government. *See Coate*, 203 Mont. at 497-98, 662 P.2d at 596-97 (holding that neither Art. VII, § 11, nor Art. VIII, § 12 (requiring the Legislature to "insure strict accountability" of money spent by the state) conferred authority on the Legislature regarding judges' timely performance of judicial duties, which was exclusively and inherently within the power of the judiciary). The Legislature's stated purpose of "[i]nvestigation into whether members of the Judiciary . . . [have acted] in violation of state law and policy" thus does not pertain to an "area[] in which it may potentially legislate or appropriate." *Barenblatt*, 360 U.S. at 111, 79 S. Ct. at 1085. The Judicial Standards Commission, not the Legislature, investigates allegations of judicial misconduct. Mont. Const. art. VII, § 11(2). Any concern about a judge or justice "pre-judging" a case or making statements about matters pending or that could come before the courts would be within the exclusive authority of the Judicial Standards Commission and the Supreme Court. *See* Mont. Code Jud. Cond. Rule 2.11(A) ("A judge shall not make any public statement that might reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court, or make any nonpublic statement that might substantially interfere with a fair trial or hearing.").

¶42 Again, the Legislature fails to "adequately identif[y] its aims and explai[n]" how the "the evidence offered" connects to the legislative purpose it puts forth.

24

*Mazars*, 140 S. Ct. at 2036.  The Legislature asserts that district court judges engage in "pre-judging" amounting to "bias" when they respond to polls used by the Montana Judges Association to determine whether to take a position, as a matter of policy, on proposed legislation affecting the function of the judiciary.

¶43    The Legislature does not define its use of the term "pre-judging."  Presumably, it implies a scenario in which a judicial officer reaches a conclusion on a pending or potential case before fully considering the law and facts presented through appropriate filings.  This scenario, however, does not arise from a judge sharing his or her view of how proposed legislation will affect the function of the judiciary, information that— provided by individuals most knowledgeable of the day-to-day functions of the judiciary—is critical to informed legislative efforts.  The Montana Judges Association's public testimony before the Legislature to advise it of the Judiciary's policy position on how a proposed measure will impact operation of the courts is to be distinguished from the role of a judge when called upon to determine the constitutionality of a statute once enacted.  *See, e.g., Brown,* ¶ 50 (noting, in upholding constitutionality of legislation abolishing the Judicial Nomination Commission, that "it is not the function of this Court to determine which process we think is the better process for making judicial appointments—it is to determine whether the process prescribed by SB 140, which is presumed to be constitutional, complies with the language and constitutional intent of

Article VII, Section 8(2)" of the Montana Constitution);[8] *Mont. Cannabis Indus. Ass'n v. State*, 2016 MT 44, ¶ 26, 382 Mont. 256, 368 P.3d 1131 (noting that, "in the context of the constitutional analysis of [an] Act [passed by the Legislature], '[o]ur role is not to second guess the prudence of a legislative decision.'" (quoting *Satterlee v. Lumberman's Mut. Cas. Co.*, 2009 MT 368, ¶ 34, 353 Mont. 265, 222 P.3d 566).  The sworn obligation of every judge is to render decisions based solely on the law and the facts of a given case. *See* Mont. Code Jud. Cond. 2.4(A)-(B) ("A judge shall not be swayed by public clamor or fear of criticism" or allow "family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment.").  Should a judge's ability or willingness to do so be called into question because of the judge's personal bias or statements, rules of this Court provide an avenue for disqualification or voluntary recusal.  *See* § 3-1-805, MCA; Mont. Code Jud. Cond. 2.12.

¶44   Neither does the Legislature specify what it means by "bias."  In *Republican Party v. White*, the United States Supreme Court provided useful insight into the matter when it considered a Minnesota rule of judicial conduct prohibiting candidates for judicial election from announcing their views on disputed legal and political issues. *Republican Party v. White*, 536 U.S. 765, 122 S. Ct. 2528 (2002).  Proponents of the law asserted that it furthered a compelling government interest in protecting the impartiality, or appearance of impartiality, of the state judiciary.  *White*, 536 U.S. at 775, 122 S. Ct. at 2535.  Before ultimately ruling that the provision was an unconstitutional

---

[8] Notably, this was the same piece of legislation that many respondents to the Montana Judges Association polling giving rise to some of the Legislature's concerns had recommended against enacting, as a matter of policy.

restriction on protected First Amendment speech, the Court addressed the possible meanings of the word "impartiality" in the context of statements by members of the state judiciary on disputed legal and political issues:

> One meaning of "impartiality" in the judicial context—and of course its root meaning—is the lack of bias for or against either party to the proceeding. Impartiality in this sense assures equal application of the law. That is, it guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party. This is the traditional sense in which the term is used.
>
> .  .  .
>
> It is perhaps possible to use the term "impartiality" in the judicial context (though this is certainly not a common usage) to mean lack of preconception in favor of or against a particular legal view. . . . A judge's lack of predisposition regarding the relevant legal issues in a case has never been thought a necessary component of equal justice, and with good reason. For one thing, it is virtually impossible to find a judge who does not have preconceptions about the law. . . . Indeed, even if it were possible to select judges who did not have preconceived views on legal issues, it would hardly be desirable to do so. Proof that a Justice's mind at the time he joined the Court was a complete tabula rasa in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias.
>
> .  .  .
>
> A third possible meaning of "impartiality" (again not a common one) might be described as openmindedness. This quality in a judge demands, not that he have no preconceptions on legal issues, but that he be willing to consider views that oppose his preconceptions, and remain open to persuasion, when issues arise in a pending case.

*White*, 536 U.S. at 775-78, 122 S. Ct. at 2535-36 (quotations and citations omitted).

¶45    In using the term "bias," the Legislature does not indicate that it wishes to investigate whether any judges had developed views on legal matters, the absence of which the United States Supreme Court found to be not only impossible but an undesirable indication of incompetence. *See also* Mont. Code Jud. Cond. 2.5 Comment 1

27

("Competence in the performance of judicial duties requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary to perform a judge's responsibilities of judicial office."). Neither has the Legislature explained how the practice of responding to Montana Judges Association polls could suggest partiality for or against any given party or a lack of open-mindedness by district court judges. Failing to show any nexus between the target of the subpoenas—polling of district court judges on their policy positions on proposed legislation that could affect the judiciary—with the supporting allegations of "pre-judging" or "bias," the Legislature has not "adequately identif[ied] its aims and explain[ed]" how the information sought relates to a valid legislative purpose or to any matter not constitutionally committed to the oversight of the Judicial Standards Commission. *Mazars*, 140 S. Ct. at 2036. Perhaps more importantly, the Legislature's asserted legislative purpose of addressing the "serious nature" of conducting such polls is undercut by the First Amendment principles at play. And in fact, the practice the Legislature seeks to investigate is encouraged by established canons of judicial conduct that recognize judges' "special expertise" in matters concerning the law, the legal system, and the administration of justice and allow judges expressly to "share that expertise with governmental bodies and executive or legislative branch officials." Mont. Code of Jud. Conduct 3.2(A) & Comment 1.

¶46 Examining the two subpoenas insofar as they concern conduct of the Court Administrator or of other Judicial Branch employees, the Legislature has failed to provide a single legitimate legislative purpose tied to matters "concern[ing] a subject on which 'legislation could be had.'" *Eastland*, 421 U.S. at 506, 95 S. Ct. at 1823 (quoting

28

*McGrain*, 273 U.S. at 177, 47 S. Ct. at 330). The asserted legislative purpose—both expressed in the April 14 subpoena and in the Legislature's filings with the Court—is to determine whether individuals violated the law. Enforcement of the law is not a "legitimate task" of the legislative function. *Watkins*, 354 U.S. at 187, 77 S. Ct. at 1179. More pointedly, the conduct the Legislature alleges does not, as a matter of law, constitute the purported legal violations it uses to support its asserted legislative purposes. And there is, of course, no legislative "power to expose for the sake of exposure.'" *Mazars*, 140 S. Ct. at 2032 (quoting *Watkins*, 354 U.S. at 200, 77 S. Ct. at 1185).

¶47 Finally, beyond the failure of a legitimate legislative purpose, the subpoenas sweep far too broadly. The subpoenas compel production of *all* of McLaughlin's e-mails within the designated time frame, not just those limited to the purposes the Legislature now articulates. The subpoenas' breadth is vast; they demand information without limitation to "public records" or "public information" and encompass all personnel-related matters, which may include confidential medical information and potential employee disciplinary matters; information regarding Youth Court matters, which are confidential by law—§§ 41-5-215 through -221, MCA; information regarding confidential matters before the Judicial Standards Commission; information in which third parties have protected privacy interests, such as disability accommodations requested by members of the public; information about potential on-going security risks to individual judges, including communications with law enforcement; and confidential

29

information related to ongoing cases and judicial work product.[9] In sum, the subpoenas are sweepingly overbroad and exceed the legislative power to "obtain[] information on matters that fall within its proper field of legislative action." Mason's Manual of Leg. Procedure, § 797.7 at 567.

¶48 In addition, the subpoenas fail to safeguard the process that ordinarily attends the issuance of such compelled process. As observed, the first subpoena was served on Director Giles only and demanded production within a twenty-four-hour period. Contrast this with Rule 45(c) and (d) of the Montana Rules of Civil Procedure, which requires service of a subpoena "no less than 10 days before the commanded production of [information]" (M. R. Civ. P. 45(c)(1)); requires the party responsible for issuing the subpoena to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena" (M. R. Civ. P. 45(d)(1)); affords opportunity for the subject of the subpoena to object (M. R. Civ. P. 45(d)(2)(B)); and requires the subpoena to be quashed or modified if it "requires disclosure of privileged or other protected matter, if no exception or waiver applies" (M. R. Civ. P. 45(d)(3)(A)(iii)). Director Giles, in turn, failed to consider the significant confidentiality and privacy interests implicated when she began her blanket release of the entirety of McLaughlin's e-mails without giving McLaughlin notice or an opportunity to review the materials and raise any such concerns or seek protection of such interests in a court of law. These basic

---

[9] *See Nelson v. City of Billings*, 2018 MT 36, ¶¶ 20-21, 390 Mont. 290, 412 P.3d 1058 (citing Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, Vol. V, pp. 1678; Montana Constitutional Convention, Verbatim Transcript, March 16, 1972, Vol. VII, pp. 2499-500 (in which the delegates discussed that the term "public bodies" under the right to know provision could not reasonably be read to allow judicial deliberations to become public)).

safeguards guarantee minimum standards of due process and should have been understood and respected by both the legislative and executive branch officials involved. *See Labair v. Carey*, 2017 MT 286, ¶ 20, 389 Mont. 366, 405 P.3d 1284 (recognizing notice and opportunity to be heard as "the hallmarks of due process" and noting that "[n]otice must be reasonably calculated to inform parties of proceedings which may directly and adversely affect their legally protected interests") (internal citations and quotations omitted); *Dorwart v. Caraway*, 1998 MT 191, ¶ 93, 290 Mont. 196, 966 P.2d 1121 (stating, "[i]n general, due process requires notice which, under the circumstances, is reasonably calculated to inform interested parties of the action and afford them an opportunity to present objections") (citations omitted).

¶49 In short, the two subpoenas fail to offer evidence that would "establish that a subpoena advances a valid legislative purpose," seek information that "other sources could reasonably provide," are far "broader than reasonably necessary" to serve the stated goals, and jeopardize the protected constitutional rights of others. *Mazars*, 140 S. Ct. at 2035-36. *Mazars* instructs us to "carefully scrutiniz[e]" subpoenas that do "not represent a run-of-the-mill legislative effort" but originate from a "political branch" with "incentives to use subpoenas for institutional advantage" over another independent branch. *Mazars*, 140 S. Ct. at 2034, 2036. These concerns undoubtedly are implicated here.

¶50 This is not to say that the Court Administrator is insulated from revealing information to the legislative branch of state government. Far from it. As noted, the Legislature has enacted statutes that require her to submit regular reports to the

31

Legislature regarding budgetary matters, as well as requested information about "business transacted by the courts." Section 3-1-702(2), MCA. In addition, the Legislature has vested its Legislative Auditor with broad authority to conduct financial and compliance audits of all agencies and to examine their "books, accounts, activities, and records, confidential or otherwise[.]" Sections 5-13-303, -309, MCA. The Legislative Auditor's authority encompasses review of the Judicial Standards Commission. Section 3-1-1125, MCA. The Legislature thus has provided for alternative means by which to obtain information and to determine accountability of administrative matters in the Judicial Branch. *See Mazars*, 140 S. Ct. at 2035 (a legislative body may not compel information from a coequal branch of government through subpoena "if other sources could reasonably provide" the necessary information).

¶51    Is there nonetheless, as the Legislature suggests, a place for discussion among the branches if it desires more dialogue with the Court or information from the Judicial Branch? Likely so. But that is not what this Petition is about and not what the Legislature suggested when it resorted to direct subpoena without opening any such discussion with the Judicial Branch and without even giving McLaughlin notice of the first subpoena. Inquiries for information through these means might have averted interbranch confrontation—and could in the future—had the Legislature pursued a path of "negotiation and compromise" before it subpoenaed the broad swath of McLaughlin's records at issue without any notice to the Judicial Branch.

¶52    Finally, we address the Legislature's assurances that it will review and redact any personal, confidential, or otherwise protected information and will not publicly disclose

32

such information. Here again, the balancing of interests to protect individual privacy rights and other confidential information is exclusively a function of the courts. For example, Montana's Constitutional Convention delegates presumed the judiciary would conduct the balancing of constitutional interests such as the right to know (Art. II, § 9) and right to privacy (Art. II, § 10). *See* Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, Vol. V, pp. 1671-72, 1677 (showing that the delegates rejected an amendment that would have allowed the Legislature to "set the situations in which individual privacy exceeds the merits of public disclosure" because they "had faith in our courts to strike this balance" and "did not feel that this particular provision should be left to the Legislature to interpret").

¶53 Indeed, as recently explained in *Comm'r of Political Practices*, ¶ 15, "[w]henever a government entity seeks to exercise the power of the state to compel an individual . . . to relinquish documents or to appear for examination, due process concerns are necessarily implicated, which in turn necessarily implicates judicial oversight." *See also Bozeman Daily Chronicle v. City of Bozeman Police Dep't*, 260 Mont. 218, 229, 859 P.2d 435, 442 (1993) (recognizing that the "proper method" to ensure protection of rights to individual privacy and to public participation is for the courts to conduct *in camera* review of the documents allegedly implicating privacy interests); *Krakauer v. State*, 2016 MT 230, ¶ 39, 384 Mont. 527, 381 P.3d 524 (noting that "*in camera* review is particularly appropriate when the interests of third parties are involved" and where the records are "extensive"); *Crites v. Lewis & Clark County*, 2019 MT 161, ¶ 27, 396 Mont. 336, 444 P.3d 1025 (holding that, "[b]ecause the judiciary

33

has authority over the interpretation of the Constitution, it is the courts' duty to balance the competing rights at issue in order to determine what, if any information, should be given to a party requesting information from the government," and thus "a district court always retains the authority to conduct an *in camera* review"); *Havre Daily News, LLC v. City of Havre*, 2006 MT 215, ¶ 23, 333 Mont. 331, 142 P.3d 864 (recognizing that balancing constitutional rights "demands that the court determine the merits of publicly disclosing the discrete pieces of information at issue, which again involves a fact-specific inquiry, taking consideration of the particular context from which such disclosure will proceed").

¶54 Legislative subpoenas to a governmental officer reaching information that may be protected by law require that the matter first be submitted to a court for *in camera* review of the affected information and an order for any necessary redactions. *See, e.g., Billings Gazette v. City of Billings*, 2013 MT 334, ¶¶ 50, 53, 372 Mont. 409, 313 P.3d 129; *T.L.S. v. Mont. Advocacy Program*, 2006 MT 262, ¶ 25, 334 Mont. 146, 144 P.3d 818. Further, before releasing any requested records or seeking court review, the governmental officer should have the opportunity to review the requested records to determine if any constitutionally protected privacy rights could be implicated. *See City of Billings Police Dep't v. Owen*, 2006 MT 16, ¶¶ 28-29, 331 Mont. 10, 127 P.3d 1044 (holding that a government agency validly reviewed its records subject to a right to know request to determine what information and documentation should be kept confidential in order to protect the privacy rights of third party individuals; "denying administrative agencies the authority or jurisdiction to make the initial decision

on whether its records may be examined, would put the 'right to know' out of reach for most citizens").

## CONCLUSION

¶55  For the foregoing reasons, we conclude that the April 8, 2021, subpoena issued by the Chair of the Senate Judiciary Committee to Director Misty Ann Giles and the April 14, 2021, subpoena issued by the Senate President and Speaker of the House to Court Administrator Beth McLaughlin do not serve a valid legislative purpose, are impermissibly overbroad, and therefore are invalid.

¶56  IT IS THEREFORE ORDERED that the Legislature's Motion to Dismiss the Petition is DENIED.

¶57  IT IS FURTHER ORDERED:

   a. The April 8, 2021 subpoena to Montana Department of Administration Director Misty Ann Giles and the April 14, 2021 subpoena to Beth McLaughlin are QUASHED or, if withdrawn, not available for reissue.

   b. Director Giles or anyone acting under the Department's or the Legislature's direction is permanently ENJOINED from further compliance with the subject subpoenas and prohibited from producing, re-producing, or disclosing any documents or information sought under the subject subpoenas;

   c. The Montana Legislature and its counsel are permanently ENJOINED from disseminating, publishing, re-producing, or disclosing in any manner,

internally or otherwise, any documents produced pursuant to the subject subpoenas; and

d. The Montana Legislature is ORDERED to immediately return any materials produced pursuant to the subject subpoenas, or any copies or reproductions thereof, to Court Administrator Beth McLaughlin.

The Clerk of this Court is directed to notify all counsel of record of the entry of this Opinion and Order.

DATED this 14th day of July, 2021.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ INGRID GUSTAFSON
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ DONALD HARRIS
Hon. Donald Harris, District Judge,
sitting by designation for Justice Jim Rice

Justice Laurie McKinnon, specially concurring.

¶58 I write separately to underscore that quashing the Legislature's subpoenas is mandated by the constitutional doctrine of separation of powers. While the Court correctly states the law on many areas related to the Legislature's inherent investigatory power; here, the dispositive question is whether the Legislature seeks to investigate misconduct of the Judicial Branch—a question that raises serious separation of powers concerns. As it clearly does seek to investigate purported judicial branch misconduct,

36

and this clearly does *not* constitute a "valid legislative purpose," I would decide this case upon that basis. By addressing the particulars and substance of the subpoenas (public records and records retention, Opinion, ¶¶ 22-31; use of state resources to lobby, Opinion, ¶¶ 32-37; statements by judges, Opinion, ¶¶ 38-45; overbreadth, Opinion, ¶ 47, process attendant to issuing subpoenas, Opinion, ¶ 48) the Court, though correct on the law, obscures the mark. In doing so, the Court implicitly lends credibility and legitimacy to a legislative act which was blatantly designed to interfere with, if not malign, a co-equal and independent branch of government. The constitutional doctrine of separation of powers does not tolerate the control, interference, or intimidation of one branch of government by another. Upon this basis I would quash the subpoenas.

¶59 I begin by addressing the Legislature's motion to dismiss. In its motion, the Legislature maintains it "has the power and the obligation to serve as the check and balance for the judicial branch of government, and the Legislature's investigation will not be further disrupted or disturbed." The Legislature maintains that the Court's April 11, 2021 order is "not binding on the legislative branch and will not be followed" and that this Court has no jurisdiction or authority over the Legislature's subpoena power. The Legislature advises it "will continue its investigation" and that "Acting-Director Giles will obey the legislative subpoena or be subject to contempt . . . ." The Legislature states that the Court must dismiss the Petition for "failure of jurisdiction."

¶60 The constitutional doctrine of separation of powers provides that, while vested with the power to make laws, the Legislature cannot also execute and adjudicate them. The Legislature's argument is the same as that expressed by Parliament in seventeenth

37

century England when Parliament declared that no court had jurisdiction to consider the exercise of its contempt power or the assertion of privilege when Parliament exercised its authority to investigate. "Almost from the beginning, both the House of Commons and the House of Lords claimed absolute and plenary authority over their privileges" and "[o]nly Parliament could declare what those privileges were or what new privileges were occasioned, and only Parliament could judge what conduct constituted a breach of privilege." *Watkins*, 354 U.S. at 188, 77 S. Ct. at 1179. It was thus inevitable that the power claimed by Parliament would be abused. Individual rights and an independent judiciary could not, and did not, exist in seventeenth century England. As Montesquieu warned, if the judicial powers were "joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would then be the legislator." 1 Charles de Secondat baron de Montesquieu, *The Spirit of the Laws* 182 (J. V. Prichard ed. & Thomas Nugent trans., D. Appleton and Co. 1900) (1748). And, as late as the mid-nineteenth century, absolute and plenary authority remained with Parliament. In 1835, the House of Commons appointed a select committee to inquire into the Orange Institution, a political-religious organization opposed to the Protestant religion and in favor of the growth of the British Empire. The House of Commons summoned a witness and demanded that he produce all the records of the organization. When he refused because the "letter-book" contained records of private communications, the House of Commons committed him to Newgate Prison. *Watkins*, 354 U.S. at 191, 77 S. Ct. at 1181 (citing H. Comm. J. (1835) 533, 564-65, 571, 575).

38

¶61    Presently, Parliament uses Royal Commissions of Inquiry which are comprised of experts who closely adhere to the subject matter committed to them.  "Seldom, if ever, have these commissions been given the authority to compel the testimony of witnesses or the production of documents."  *Watkins*, 354 U.S. at 192, 77 S. Ct. at 1181.  "Their success in fulfilling their fact-finding missions without resort to coercive tactics is a tribute to the fairness of the processes to the witnesses and their close adherence to the subject matter committed to them." *Watkins*, 354 U.S. at 192, 77 S. Ct. at 1181.

¶62    Until today, this Country's history was quite different from seventeenth century England.  Never has a legislative branch of government presumed, until today, that its investigative authority to summon witnesses and documents was unrestrained, plenary, and unreviewable by the judicial branch for violations of fundamental rights and privileges.  As there lingered direct knowledge of the evil affects of absolute power in England, Congress rarely utilized compulsory process, except when making inquiries concerning the elections or privileges of members to Congress.  Indeed, the nation was over 100 years old before the Supreme Court heard its first dispute concerning the authority of Congress to subpoena witnesses pursuant to its inherent investigative authority.  In *Kilbourn v. Thompson*, 103 U.S. 168 (1881), the House of Representatives authorized an investigation into the circumstances surrounding the bankruptcy of Jay Cooke & Company, in which the United States had deposited funds and a private real estate pool that was a part of the financial structure became the subject of the House's interest.  The Supreme Court concluded that the subject matter of the inquiry was "in its nature clearly judicial and therefore one in respect to which no valid

39

legislation could be enacted." *Watkins*, 354 U.S. at 194, 77 S. Ct. at 1182 (citing *Kilbourn*, 103 U.S. at 192, 195). Thus, "[u]nlike the English practice, from the very outset the use of contempt power by the legislature was deemed subject to judicial review." *Watkins*, 354 U.S. at 192, 77 S. Ct. at 1181.

¶63 Even before *Kilbourn* was decided there was a fundamental and basic understanding in every court of this country, and those coming before the courts, that the constitution is "the fundamental and paramount law" and the fundamental "theory of every [constitutional] government" is "that an act of the legislature, repugnant to the constitution, is void. . . . It is emphatically the province and duty of the judicial department to say what the law is" and "of necessity [to] expound and interpret that rule" to resolve any conflict of law. *Marbury*, 5 U.S. (1 Cranch) at 177. Montana, for anyone who did not know, follows *Marbury v. Madison*. "[T]his Court and its subordinate courts have the exclusive authority and duty to adjudicate the nature, meaning, and extent of applicable constitutional, statutory, and common law and to render appropriate judgments thereon in the context of cognizable claims of relief." *Larson v. State*, 2019 MT 28, ¶ 42, 394 Mont. 167, 434 P.3d 241.

¶64 Montana is not seventeenth century England. This Court has the constitutional responsibility to assess whether the Legislature's subpoena infringes upon fundamental rights, violates privileges recognized by law, or is otherwise improper. Upon this basis, I would deny the Legislature's motion to dismiss.

¶65 We are asked to determine whether the Legislature's subpoena is within the legislative power, a question that raises serious separation of powers concerns about how

a legislative committee may investigate the judicial branch.  The Supreme Court stated in *Loving v. United States*, 517 U.S. 748, 757, 116 S. Ct. 1737, 1743 (1996), "it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another."  Former Chief Justice Warren Burger wrote in his concurring opinion in *Nixon v. Fitzgerald*, 457 U.S. 731, 760-61, 102 S. Ct. 2690, 2707 (1982), that "the essential purpose of the separation of powers is to allow for independent functioning of each coequal branch of government within its assigned sphere of responsibility, free from risk of control, interference, or intimidation by other branches." No branch of government organized under a constitution may exercise any power that is not explicitly bestowed by that constitution or that is not essential to exercise the constitutional power.  *See Marbury*, 5 U.S. (1 Cranch) at 176-77.  Montana's Separation of Powers provision is contained in Article III, Section 1, of Montana's 1972 Constitution.  It provides:

> The power of the government of this state is divided into three distinct branches—legislative, executive, and judicial.  No person or persons charged with the exercise of power properly belonging to one branch shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.

¶66    Constitutional powers, however, do not stand in isolation; rather, they are part of a complex structure in which each power acquires specific content and meaning in relation to the others.  The Supreme Court often defines the scope and locates the limits of one constitutional power by identifying what is at the core of the other.  *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 722, 106 S. Ct. 3181, 3186 (1986) ("The Constitution does not contemplate an active role for Congress in the supervision of officers charged with the

41

execution of the laws it enacts."); *Myers v. United States*, 272 U.S. 52, 164, 47 S. Ct. 21, 41 (1926) ("[A]rticle II excludes the exercise of legislative power by Congress to provide for appointments and removals, except only as granted therein to Congress in the matter of inferior offices . . . ."); *Kilbourn*, 103 U.S. at 192, (the House "not only exceeded the limit of its own authority, but assumed a power which could only be properly exercised by another branch of the government, because it was in its nature clearly judicial.").

¶67    Our federal and state constitutions vest legislatures with an investigative power ancillary to their power to enact laws. The investigative power is "co-extensive with the power to legislate." *Quinn v. United States*, 349 U.S. 155, 160, 75 S. Ct. 668, 672 (1955); *Watkins*, 354 U.S. at 187, 77 S. Ct. at 1179 ("The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad."). Thus, the legislature can issue a subpoena in connection with any proper legislative function or concerning any area in which it can appropriately legislate. In *McGrain*, the Supreme Court stated that "[t]he power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function . . . . [I]t falls nothing short of a practical construction, long continued, of the constitutional provisions respecting their powers . . . ." *McGrain*, 273 U.S. at 174, 47 S. Ct. at 328-29.

¶68    Determining the constitutional limits of the legislature's plenary lawmaking authority in the context of the separation of powers between the judicial and legislative branches must proceed on a case-by-case basis. *State ex rel. Veskrna v. Steel*, 894 N.W.2d 788, 801 (Neb. 2017). The overlapping exercise of constitutionally delegated powers focuses on the extent to which one branch is prevented from

accomplishing its constitutionally assigned functions, balanced against the other branch's need to promote the objectives within its constitutional authority. *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443, 97 S. Ct. 2777, 2790 (1977). Most importantly, a legislative subpoena is valid only if it is "related to and in furtherance of, a legitimate task of the [legislature]." *Watkins*, 354 U.S. at 187, 77 S. Ct. at 1179. The subpoena must serve a "valid legislative purpose," *Quinn*, 349 U.S. at 161, 75 S. Ct. at 672; it must "concern[] a subject on which 'legislation could be had.'" *Eastland*, 421 U.S. at 506, 95 S. Ct. at 1823 (quoting *McGrain*, 273 U.S. at 177, 47 S. Ct. at 330.)

¶69     The scope of legislative authority over the judicial branch is illustrated by several scenarios. First, the legislature has the power to define the substantive law that courts must apply; however, the judiciary must ensure that those laws do not violate individual rights. If the legislature disagrees with a court's decision it may enact a statute to reverse the effect of the decision, provided it does not change the result of the specific case. Thus, the legislature has substantial investigatory power to investigate the appropriateness of proposed new substantive laws. The legislature also has substantial, although not unlimited nor undisputed, power to regulate the procedures utilized by courts—the distinction being drawn between substantive and procedural rulemaking. Additionally, the legislature, through its control of the appropriations process, has substantial authority over both the judicial branch budget and the administrative structure by which the judicial branch is managed. Given the legislature's authority to create, modify, and fund the bureaucracy by which the judicial branch manages itself, the

43

legislature has substantial authority over changes in the structure of the judicial branch and what changes should be made to advance its policy objectives.

¶70 Weighed against the legislature's authority to investigate is the equally weighty authority of the judicial branch to maintain its independence from the political influences of the legislature. The Framers clearly intended the courts would operate independently from the political and partisan interests and influences of both the executive and legislative branches. There must be a constitutional separation of powers by recognizing that the legislature's investigatory authority does not extend to investigating the duties or the performance of judicial branch employees while performing judicial branch work-related functions. Other limitations on the legislature's inherent investigatory authority include Montana's Article II fundamental rights, our federal rights contained in the Bill of Rights, and other privileges and protections provided by law. The mere semblance of a legislative purpose would not justify an inquiry that violates individual rights, particularly our fundamental rights contained in Article II and the Bill of Rights. *Watkins*, 354 U.S. at 198, 77 S. Ct. at 1185. Furthermore, we cannot simply assume that a legislative inquiry, presumably premised upon public need, outweighs the individual rights of an unwilling witness who believes the subpoena is unlawful. To do so would be to abdicate the "responsibility placed by the Constitution upon the judiciary to insure that the [legislature] does not unjustifiably encroach upon an individual's right to privacy nor abridge his liberty of speech, press, religion or assembly." *Watkins*, 354 U.S. at 198-99, 77 S. Ct. at 1185. Lastly, there is no legitimate legislative purpose to expose for the sake of exposure. The public is entitled to be informed concerning the workings of

44

government, but that cannot be inflated into a power to expose at the cost of individual rights. *Watkins*, 354 U.S. at 200, 77 S. Ct. at 1185-86.

¶71    When addressing a separation of powers issue, it is important to understand the branches are to work together to secure a workable government for its citizens while respecting each branch's autonomy.  "Though faithful to the precept that freedom is imperiled if the whole of legislative, executive, and judicial power is in the same hands, The Federalist No. 47, pp. 325-26 (J. Madison) (J. Cooke ed. 1961), the Framers understood that a 'hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively.'"  *Loving*, 517 U.S. at 756, 116 S. Ct. at 1743 (quoting *Buckley v. Valeo*, 424 U.S. 1, 121, 96 S. Ct. 612, 683 (1976) (per curiam)).  A key contention in Justice Robert H. Jackson's[1] concurring opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S. Ct. 863, 870 (1952) was that "[w]hile the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government.  It enjoins upon its branches separateness but interdependence, autonomy but reciprocity."  When one branch fails to afford proper deference to the authority and expertise of a coequal branch, the goal of securing a "workable government" becomes elusive.  For instance, Chief Justice William H. Rehnquist deplored the failure of Congress to obtain the views of the judicial branch before enacting the Feeney Amendment of the PROTECT Act, which restricted a judge's

---

[1] President Truman named Justice Jackson as chief prosecutor for the United States at the Nuremberg war-crimes trials, which necessitated his absence from work of the Supreme Court for nearly a year and a half.

authority to authorize downward departures from the federal Sentencing Guidelines and required de novo review of a judge's fact-based departures from the Guidelines. The Chief Justice wrote:

> Obtaining the views of the Judiciary before the PROTECT Act was enacted would have given all members of Congress the benefit of a perspective they may not have been aware of on this aspect of the legislation and other aspects that deal with a delicate process that judges understand very well. Congress may well have enacted these provisions of the PROTECT Act in any event. But at least judges would have known that the process included a meaningful opportunity to have their views heard.
>
> .        .        .
>
> Judges, though, have a perspective on the administration of justice that is not necessarily available to members of Congress and the people they represent. Judges have, again by Constitutional design, an institutional commitment to the independent administration of justice and are able to see the consequences of judicial reform proposals that legislative sponsors may not be in a position to see. Consultation with the Judiciary will improve both the process and the product.[2]

¶72     In the spirit of integrating diverse powers of government and providing citizens with a "workable government," judges have frequently testified before the legislature on matters concerning judicial administration, representation of indigent defendants, habeas corpus appeals, exclusionary rule modifications, judge's use of legislative history, juvenile delinquency reform, criminal justice reform, and civil justice reform. Judicial input on matters that relate so integrally to the operation of the judicial branch clearly benefits both the courts and the legislature. Restricting these opportunities would have a

---

[2] William H. Rehnquist, 2003 Year-End Report on the Federal Judiciary, pt. II (Jan. 1, 2004), https://www.supremecourt.gov/publicinfo/year-end/2003year-endreport.aspx.

serious adverse effect on the ability of the judicial and legislative branches to offer its citizens a workable government that integrates each branch's diverse powers.

¶73    I now turn to the legislative subpoenas issued in these proceedings. [3]

¶74    There can be no denying that the subpoenas issued here were for the purpose of investigating purported judicial misconduct. The mere semblance or whitewashing of a legislative purpose does little to conceal that the Legislature's primary goal is to find and expose violations by judges, if not the entire Judicial Branch, of ethical codes, state law, and state policy—and, presumably, to cast the Judicial Branch in a nefarious light. The misconduct specifically alleged is that the judiciary and the Court Administrator deleted public records in violation of state law and policy; that a Montana Judges Association poll was conducted using state resources; and members of the judiciary were polled to "prejudge" legislation and issues which would come before the courts for decision. These are plainly allegations of misconduct, without any connection to a legitimate legislative purpose. Clearly a valid legislative purpose for issuance of an investigatory subpoena could be related to the judiciary's budget, appropriations, substantive civil and criminal law reform, court programs, pretrial programs, treatment courts, and the like.

---

[3] The Supreme Court in *Mazars*, 140 S. Ct. at 2035 held that:

> separation of powers concerns are no less palpable here simply because the subpoenas were issue to third parties. Congressional demands for the President's information present an interbranch conflict no matter where the information is held—it is, after all, the President's information. Were it otherwise, Congress could sidestep constitutional requirements any time a President's information is entrusted to a third party—as occurs with rapidly increasing frequency.

Accordingly, no distinction can be drawn because the subpoena was issued to the judicial branch's Court Administrator. The subpoenas still seek Judicial Branch email communications.

However, that is not the stated purpose of the legislative subpoena here. Moreover, the legislature is already provided information by the Court Administrator through § 3-1-702, MCA, which informs the legislature of judicial branch operations. That section provides that the Court Administrator will:

> (1) prepare and present judicial branch requests to the legislature, including the costs of the state-funded district court program;
> (2) collect, compile, and report statistical and other data relating to the business transacted by the courts and provide the information to the legislature on request.

Section 3-1-702, MCA, thus, is the statutorily created method by which the judicial branch informs the legislature about judicial branch operations so that the legislature may enact well-informed legislation. Section 3-1-702, MCA, helps facilitate the legislature's ancillary authority to investigate for purposes of developing law consistent with the legislature's policy and agenda.

¶75 The Legislature's ill-informed efforts to investigate the judiciary are also plainly incongruous to Montana's Constitution and the constitutionally created method for addressing the discipline and removal of judges for misconduct. Section 11 of the Judiciary Article provides for the removal and discipline of Montana judges and requires that the legislature create a Judicial Standards Commission. The purpose of the Judicial Standards Commission is:

> to protect the public from improper conduct or behavior of judges; preserve the integrity of the judicial process; maintain public confidence in the judiciary; create a greater awareness of proper judicial conduct on the part of the judiciary and the public; and provide for the expeditious and fair disposition of complaints of judicial misconduct.

48

Procedural Rules of the Judicial Standards Commission Rule 1(b). The Commission "shall investigate complaints" and has the constitutional authority to subpoena witnesses and documents. Mont. Const. art. VII, § 11(2). Consistent with the separation of powers, the Judicial Standards Commission is confined to investigating and making recommendations, with the final decision on removal and discipline of judges left to the Montana Supreme Court. Mont. Const. art. VII, § 11(2). The Constitution, therefore, commits judicial oversight over misconduct to the judicial branch and limits the legislature's role to the creation of a commission. Mont. Const. art. VII, § 11. By allocating specific powers and responsibilities to the Commission fitted to the task, the Delegates to the 1972 Constitutional Convention created a process that is both effective and accountable for addressing judicial misconduct. Allegations of judicial branch misconduct, consistent with the separation of powers and the constitutionally created commission, are left to be handled by the judicial branch.

¶76    Here, the purpose of the Legislature's subpoena is to investigate purported Judicial Branch misconduct. The most important question is not whether the Legislature has put forth some vague statement of a legitimate legislative purpose, but rather whether the Legislature is investigating suspicions of judicial misconduct. Such investigations by the Legislature may constitutionally be pursued by filing a complaint with the Judicial Standards Commission. The independence of the judicial branch would be undermined if a legislative body, in its discretion, possessed the authority, outside of constitutional authority, to compel the production of judicial branch communications. "In the absence of express constitutional authority, the legal authority of the Legislative Branch to

49

subpoena members of the [the judicial branch] cannot be coterminous with the broad scope of the legislature's constitutional authority to enact legislation or otherwise conduct hearings on matters of public interest." *Sullivan v. McDonald*, No. CV064010696, 2006 Conn. Super. LEXIS 2073, at \*17-18 (June 30, 2006). Otherwise, the legislature's authority to compel testimony about purported judicial misconduct would be limitless. These constitutional boundaries make sense. If members of the judiciary operated under the constant threat of having their work-related communications and judicial communications brought before the legislature, the judicial branch would be at serious risk of losing its identity as an independent branch of government. It remains a basic principle of our constitutional scheme that one branch of the government may not intrude upon the central prerogatives of another or impair another branch in the performance of its constitutional duties.

¶77 Finally, I must address the propriety of conducting the Montana Judges Association[4] poll to advise the Legislature on a matter that concerned the Judicial Branch. Informing a coequal branch of government about a matter that concerns judicial branch operations is part of each branch's obligation to provide for a "workable government." The poll informed the Legislature on a process about which judges have distinct and expert knowledge. Every judge in Montana's Judicial Branch has gone through a "selection" process—whether by appointment or election. The statute being considered by the Legislature altered the manner in which judges would be selected for interim vacancies. The survey sent to Montana judges asked whether the Judicial Branch, as a

---

[4] The Montana Judges Association purpose is to provide an education forum for Montana judges.

50

whole, thought the legislation was advisable. The poll generally expressed the view that the legislation, which affected the Judicial Branch, was not. The poll did not seek a judicial decision concerning whether the proposed legislation was constitutional. The Legislature has failed to draw this important distinction between a judge's oath to make a fair and impartial judicial decision and advising the legislature on a matter that affects branch operations. As recognized by Chief Justice Rehnquist, judges' perspectives on a matter affecting the judicial branch will improve both the process and the product. Judges are able to see the consequences of legislative efforts at judicial reform, and their perspective on the administration of justice and communication to the legislature of their views helps ensure that Montana citizens have a workable government. The poll was an effort towards this end, not a prejudgment on the Legislature's newly enacted laws. To the extent any judge cannot fairly and impartially judge the constitutionality of a statute, they are obligated by both the Judicial Code of Ethics and their conscience to recuse themselves. Judges ask themselves these questions every day. The Legislature fails to grasp this distinction and continues to assert judicial misconduct, making a workable government for the people of Montana ever more elusive.

¶78    In conclusion, it seems fitting, given the circumstances of this litigation and its blemish upon Montana's history, that a final reference to *Marbury v. Madison* be had. "The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury*, 5 U.S. (1 Cranch) at 176. The constitutional doctrine of separation of powers is one such limit. It is upon this basis that I would resolve these proceedings.

51

/S/ LAURIE McKINNON

Justice Dirk Sandefur, concurring.

¶79    I concur completely in the Court's comprehensive analysis and holdings regarding the constitutional contours of the Legislature's constitutionally implied subpoena power in general, and the manifest invalidity of the subject legislative subpoenas in particular. I briefly write separately, however, to further concur in Justice McKinnon's special concurrence, as supplemental reasoning wholly consistent with the Court's main analysis and holdings, and to call-out what this recklessly ginned-up "crisis" is truly about.

¶80    Contrary to the irresponsible rhetoric that has and will likely continue to spew forth from those intoxicated with their long-sought unitary control over the political branches of government, this case is not about judicial disregard of the public's right to know, noncompliance with applicable public records retention laws, judicial bias, or judicial "lobbying." The Court's opinion clearly lays bare the absurdity of those patently false and intentionally inflammatory political talking-points, revealing a far more sinister motive. Beyond the smoke-screen of the catchy but demonstrably false allegations leveled against the judiciary is an unscrupulously calculated and coordinated partisan campaign to undermine the constitutional function of Montana's duly-elected non-partisan judicial branch to conduct independent judicial review of legislative enactments for compliance with the supreme law of this state—the Montana Constitution.

52

¶81 Despite the dismissive assertions of some, this case and the underlying case from which it sprung[1] are not the result of some petty and obscure turf war between government entities, with the public interest trailing far behind, if at all. This and the related cases are about protecting and preserving the existence and integrity of rule of law under the supreme law of this State for the mutual benefit of all and posterity, *regardless of partisan political stripe, agenda, or divide*. These cases are about the exclusive constitutional authority of the Judicial Branch to interpret the meaning and scope of constitutional rights, protections, limitations, the nature and extent of the duties and powers apportioned to each of the separate branches of government and constitutional officers thereunder, and to interpret and apply the governing law to particular factual circumstances. And, fundamentally, this case is also about dispelling the infantile notion that one coequal branch of constitutional government can legally divest another of its constitutional authority and duty based on contrived allegations of institutional conflict of interest.

¶82 Regardless of competing interests pertinent in the two political branches of government and society in general, or the dominant will of any majority political faction at any particular time, the continued survival and vitality of our constitutional democracy, and all of the personal and societal freedoms, protections, and other benefits it provides,

---

[1] *See* Order, *McLaughlin v. Montana State Legislature*, No. OP 21-0173 (June 29, 2021); *McLaughlin v. Montana State Legislature*, 2021 MT 120, 404 Mont. 166, __ P.3d __; *Brown v. Gianforte*, 2021 MT 149, 404 Mont. 269, __ P.3d __; Order, *McLaughlin v. Montana State Legislature*, No. OP 21-0173 (April 16, 2021); Order, *Bradley v. Gianforte*, No. OP 21-0125 (April 7, 2021). *See also* Preliminary Injunction Order, *Rice v. Montana State Legislature*, BDV-2021-451, Mont. First Judicial Dist., Lewis and Clark County, (May 18, 2021).

depend on the preservation of and respect for the distinct functions of all three co-equal branches of government, without any usurpation or interference with one by another. This simple, self-evident principle is more important than ever when, as now, a single political faction overwhelmingly controls the two partisan branches of state government, rendering it quite expedient to irresponsibly attack and attempt to undermine the only non-partisan branch in an effort to attain unitary, unfettered—in effect, authoritarian— power, unconstrained by constitutional limits.

¶83 Justice McKinnon's reminder of the rampant "legislative" abuses of the then-unchecked English Parliament aptly illustrates the historical abuse of legislative power that led to the development and continued essential utility of our distributed form of constitutional democracy. It thus calls to mind the 1887 observation of English historian and moralist John Emrich Edward Dalberg Acton (Lord Acton) that "absolute power corrupts absolutely," a circumstance our distributed form of constitutional government is designed to avoid. Though undeniable, the fleeting mandate and accompanying delirium of unitary control of the two political branches of government is no warrant or excuse for reckless disregard of the sacred oath and duty of *all* elected officials to "support, protect, and defend the constitution" of this State. *See* Mont. Const. art. III, § 3.

/S/ DIRK M. SANDEFUR